**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | Civil Action No: 1:21-cv-02863 |
| v. | |
| LJM FUNDS MANAGEMENT LTD, LJM PARTNERS LTD, ANTHONY J. CAINE, and ANISH PARVATANENI, | Hon. Ronald A. Guzman |
| | JURY DEMAND |
| Defendants. | |

## DEFENDANTS' ANSWER TO COMPLAINT

Defendants LJM Funds Management Ltd. ("LJMFM"), LJM Partners Ltd. ("LJM Partners") (collectively, "LJM") Anthony J. Caine ("Caine") and Anish Parvataneni ("Parvataneni") (collectively, "Defendants") by and through their attorneys, submit the following Answer to Plaintiff Commodity Futures Trading Commission's Complaint, as follows:

### SUMMARY

1.     From at least June 2016 through February 2018 (the "Relevant Period"), Defendants LJM Funds Management Ltd. and LJM Partners Ltd. (collectively "LJM"), both registered Commodity Pool Operators ("CPOs") (LJM Partners Ltd. was also a registered Commodity Trading Advisor ("CTA")), Anthony J. Caine ("Caine") and Anish Parvataneni ("Parvataneni"), both registered Associated Persons of LJM, violated the Commodity Exchange Act ("CEA") and CFTC Regulations ("Regulations") by defrauding or deceiving prospective and existing pool participants through false and misleading statements or omissions concerning worst-case scenarios for LJM's short options trading strategy and LJM's risk management tools, or engaging in acts that operated as a fraud or deceit upon pool participants. Defendants LJM and Caine also failed to supervise their sales staff regarding the aforementioned false and misleading statements, as well as others described herein, that were made to existing and prospective pool participants, or their agents, in violation of the Regulations.

**ANSWER:**     Defendants deny the allegations of paragraph 1.

2.     Defendant Caine is the owner, founder, co-portfolio manager, Chairman and a registered Associated Person ("AP") of LJM who knowingly induced LJM's violations or did not act in good faith.

**ANSWER:** Defendants deny that Caine knowingly induced any violations or failed to act in good faith and Defendants admit the remaining allegations of paragraph 2.

3. Defendant Parvataneni was the Chief Portfolio Manager and an AP of LJM who knew of the false and misleading statements described herein by LJM to pool participants and wrote at least two monthly newsletters to LJM pool participants that made false and misleading statements concerning LJM's risk profile.

**ANSWER:** Defendants admit that Parvataneni functioned as the Chief Portfolio Manager and as an AP of LJM and deny the remaining allegations of paragraph 3.

4. LJM's central trading strategy relied primarily on selling options on S&P500 futures and collecting the premiums (also called a short volatility strategy). Selling options carries the risk of large, even catastrophic, losses. However, LJM downplayed those risks by falsely claiming that maximum daily worst-case losses was 20%-40% depending on the strategy. LJM also sought to allay prospective pool participant concerns about the risks by falsely touting it had "robust" risk management that utilized historical scenario analysis. LJM's ability to promote its risk management was a critical component of marketing LJM for at least some of the LJM sales staff. In reality, LJM purposely ignored the impact of volatility risk in monitoring the portfolio's risk levels and dismissed the results of historical scenario analysis as improbable. LJM's messaging to pool participants about its ability to monitor risk and mitigate, if not avoid major losses was misleading, incomplete and, in essence, false. An email sent by one investment advisor for pool participants documents this incomplete, misleading and false messaging. In an email sent to LJM on February 9, 2018, in the days following the collapse of LJM's portfolio, the investment advisor wrote, he was "walked through the risk parameters in place to ensure something like this never happens. Furthermore, was assured it wouldn't and couldn't happen." Moreover, the email identified Defendant Parvataneni as participating in that conversation.

**ANSWER:** Defendants admit the allegations set forth in sentence 1 and deny the allegations in sentences 2 through 8 of paragraph 4. Defendants note that the allegations in sentences 9 through 11 refer to an email dated February 9, 2018. Defendants refer to the email dated February 9, 2018 for a more complete and accurate statement of its contents, and to the extent the allegations in sentences 9 through 11 are not consistent with the referenced email, Defendants deny the allegations.

5. Additionally, LJM, through misleading statements and material omissions, misled its pool participants about the risk profile of its portfolio. LJM routinely touted to its pool participants that it maintained a consistent risk profile. However, beginning in late 2017, the risk

2

profile of the LJM portfolios began a trend of diverging from its traditional characteristics. By late 2017, the risk profile of the LJM portfolios, unbeknownst to the LJM pool participants, had significantly deviated from their historical profile. Moreover, the portfolio was positioned in a manner that essentially doubled the size of potential losses associated with a significant drop in the S&P and a spike in volatility, compared to the historic profile of LJM's positions. None of these changes was disclosed to pool participants. LJM not only failed to disclose to its pool participants that the risk profile had deviated dramatically from its historical norms but the language of its outgoing correspondence created a misleading impression that nothing had changed.

  **ANSWER:** Defendants deny the allegations of paragraph 5.

  6. In January 2018, LJM had over $1 billion in assets under management ("AUM"). On February 5 and 6, 2018, LJM's portfolios suffered large trading losses (over 80%) when the Chicago Board Options Exchange's ("CBOE") Volatility Index ("VIX"), a measure of options expected volatility, spiked over 20 points (115%). Shortly thereafter, LJM closed its business.

  **ANSWER:** Defendants admit the allegations in sentences 1 and 3 and deny the allegations in sentence 2 of paragraph 6.

  7. As set forth in detail below, Defendants, each registered as a CPO and/or CTA and/or AP of a CPO or a CTA, violated Section 4*o*(1)(A)-(B) of the CEA, 7 U.S.C. § 6*o*(1)(A)-(B) (2018), by: (a) employing a device, scheme, or artifice to defraud pool participants or prospective pool participants; and/or (b) engaging in transactions, practices, or course of business which operated as a fraud or deceit upon prospective and existing pool participants. Defendants also violated Sections 4c(b) and 6(c)(1) of the CEA, 7 U.S.C. §§ 6c(b) and 9(1) (2018), and Regulations 33.10 and 180.1 17 C.F.R. §§ 33.10, 180.1 (2020), by: (a) cheating or defrauding or attempting to cheat or defraud any other person; (b) making or causing to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; and/or (c) deceiving or attempting to deceive any other person by any means whatsoever in connection with the entry into any commodity option transaction, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity.

  **ANSWER:** Defendants deny the allegations of paragraph 7.

  8. In addition, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2020), LJM and Caine failed to diligently supervise their employees and agents who, among other things, made certain false and misleading statements described herein and failed to comply with LJM's Risk Policy.

  **ANSWER:** Defendants deny the allegations of paragraph 8.

  9. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as

described more fully below.

      **ANSWER:**    Defendants deny the allegations of paragraph 9.

10.     Accordingly, pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel compliance with the CEA and Regulations. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

      **ANSWER:**    Defendants admit that Plaintiff purports to bring this action pursuant to

Section 6c of the CEA and deny that Defendants have engaged in any unlawful acts or practices

or that Plaintiff is entitled to any of the requested relief.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (2018), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the CEA whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

      **ANSWER:**    Defendants admit the allegations of paragraph 11.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in this District, and certain of the acts and practices in violation of the CEA have occurred, are occurring, or are about to occur within this District, among other places.

      **ANSWER:**    Defendants deny that any of their acts or practices violated the CEA and

admit the remaining allegations of paragraph 12.

## PARTIES

13.     **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with administering and enforcing the CEA and accompanying Regulations.

4

**ANSWER:** Defendants admit the allegations of paragraph 13.

14. **Defendant LJM Partners Ltd.** is an Illinois corporation with its principal place of business in Chicago, Illinois, and has been registered with the Commission as a CTA since December 1998 and a CPO since December 2002.

**ANSWER:** Defendants admit the allegations of paragraph 14.

15. **Defendant LJM Funds Management Ltd.** is an Illinois corporation with its principal place of business in Chicago, Illinois, and has been registered with the Commission as a CPO since November 2012.

**ANSWER:** Defendants admit the allegations of paragraph 15.

16. **Defendant Anthony J. Caine** is the founder, Chairman, and owner of LJM, co-managed the LJM portfolios with Chief Portfolio Manager Parvataneni, and has been registered as an AP of LJM Partners Ltd. since December 1998 and of LJM Funds Management Ltd. since November 2012. Caine is a resident of Aspen, Colorado and during the Relevant Period periodically did business from LJM's Chicago office. According to LJM, Caine has more than 30 years of options-trading experience and more than 20 years of experience managing options portfolios.

**ANSWER:** Defendants admit the allegations of paragraph 16.

17. **Defendant Anish Parvataneni** was the Chief Portfolio Manager for LJM and a registered AP of LJM Partners from April 2011 through March 2018 and of LJM Funds Management from November 2012 through March 2018. Parvataneni is a resident of Hinsdale, Illinois, and during the Relevant Period worked in LJM's Chicago office.

**ANSWER:** Defendants deny the allegations in sentence 1 and admit the allegations in sentence 2 of paragraph 17.

## BACKGROUND TERMS

18. A "commodity pool" means any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any — . . . commodity option. Section 1a(10) of the CEA, 7 U.S.C. § 1a(10) (2018).

**ANSWER:** Paragraph 18 asserts a legal conclusion and not an allegation against Defendants, and as such no response is required.

19. A "commodity pool operator" is defined by the CEA, in relevant part, as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or

receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any commodity option. Section 1a(11) of the CEA, 7 U.S.C. § 1a(11) (2018).

**ANSWER:** Paragraph 19 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

20. A "commodity trading advisor" is defined by the CEA, in relevant part, as any person who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in…commodity options. Section 1a(12) of the CEA, 7 U.S.C. § 1a(12) (2018).

**ANSWER:** Paragraph 20 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

21. An "associated person" includes any natural person who is associated with: a commodity pool operator as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged; or commodity trading advisor as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of a client's or prospective client's discretionary account or (ii) the supervision of any person or persons so engaged. Regulation 1.3, 17 C.F.R. § 1.3 (2020).

**ANSWER:** Paragraph 21 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

22. An "option" is a contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of a commodity or other instrument at a specific price within a specified period of time, regardless of the market price of that instrument. Options on the S&P 500 Index Futures Contract ("SP options") are traded on the Chicago Mercantile Exchange ("CME"), a designated contract market and registered entity pursuant to the CEA.

**ANSWER:** Defendants admit the allegations of paragraph 22.

23. A "put option" is an option contract that gives the buyer the right but not the obligation to sell a specified quantity of a particular commodity, security, or other asset or to enter into a short futures position at a given price (the "strike price") prior to or on a specified expiration date.

6

**ANSWER:**     Defendants admit the allegations of paragraph 23.

24.     A "call option" is an option contract that gives the buyer the right but not the obligation to purchase a commodity or other asset or to enter into a long futures position at a specified price on or prior to a specified expiration date.

**ANSWER:**     Defendants admit the allegations of paragraph 24.

25.     An "option writer" is the person who originates an option contract by promising to perform a certain obligation in return for the price or premium of the option. Also known as option grantor or option seller. An "option buyer" is the person who buys calls, puts, or any combination of calls and puts.

**ANSWER:**     Defendants admit the allegations of paragraph 25.

26.     The "option premium" is the payment an option buyer makes to the option writer (seller) for granting an option contract.

**ANSWER:**     Defendants admit the allegations of paragraph 26.

27.     "Out-of-the-money" is a term used to describe an option that has no intrinsic value. For example, a call option with a strike price of $400 on gold trading at $390 is out-of-the-money 10 dollars.

**ANSWER:**     Defendants admit the allegations of paragraph 27.

28.     The CBOE's VIX is a calculation designed to produce a measure of constant, 30-day expected volatility of the U.S. stock market, derived from real-time, mid-quote prices of SP call and put options.

**ANSWER:**     Defendants admit the allegations of paragraph 28.

29.     Options traders typically refer to a set of risk measures derived from the Greek letters that denote them, which indicate how sensitive an option is to time-value decay, changes in implied volatility, and movements in the price of its underlying security. These four risk measures are known as an option's theta, vega, delta, and gamma. Vega measures the risk of changes in implied volatility or the forward-looking expected volatility of the underlying asset price. Gamma measures the rate of change of an option's delta given a change in price of the underlying asset. Delta is a measure of the change in an option's price or premium resulting from a change in the underlying asset, while theta measures its price decay as time passes.

**ANSWER:**     Defendants admit the allegations of paragraph 29.

*ACTIVE 59074344v8*

## FACTUAL ALLEGATIONS

**LJM's Trading Strategies**

30.     LJM Partners Ltd. was founded by Defendant Caine in or around 1998 to act as a CTA. LJM Partners Ltd. became a registered CPO in 2002. During the Relevant Period, LJM Partners Ltd. was the CPO for at least eight commodity pools.

**ANSWER:**     Defendants admit the allegations of paragraph 30.

31.     LJM Funds Management Ltd. was founded by Defendant Caine in 2012 to manage a mutual fund called LJM Preservation and Growth Fund LP (the "P&G Fund"). The P&G Fund was also a commodity pool and LJM Funds Management Ltd. was its registered CPO.

**ANSWER:**     Defendants admit the allegations of paragraph 31.

32.     Employees worked for both LJM companies and there was no practical distinction in most situations. LJM Partners issued monthly and annual newsletters to pool participants and LJM Funds Management issued quarterly and annual newsletters to mutual fund investors. Defendant Parvataneni managed both the mutual fund and commodity pool portfolios."

**ANSWER:**     Defendants admit in sentence 1 of paragraph 32 that employees worked for both LJM companies and further state that the allegation "there was no practical distinction in most situations" is vague and ambiguous and on that basis, the allegation is denied.  Defendants admit the allegations in sentences 2 and 3 of paragraph 32.

33.     LJM had three variations on its short volatility options strategy: a) Preservation & Growth ("P&G"); b) Moderately Aggressive; and c) Aggressive. The primary differences among these strategies were the higher targeted returns for the Aggressive strategy and the relative amount of hedging for the P&G and Moderately Aggressive strategies. While LJM described P&G as having the most amount of hedging among its three strategies, Parvataneni testified that hedging via long options was on average less than 10% of the P&G portfolio.

**ANSWER:**     Defendants admit the allegations in sentences 1 and 2 of paragraph 33. Defendants note that the allegations in sentence 3 refer to sworn testimony.  Defendants refer to the sworn testimony for a more complete and accurate statement of its contents, and to the extent the allegations of sentence 3 are not consistent with the referenced testimony, Defendants deny the allegations.

34.     Defendant Parvataneni was LJM's Chief Portfolio Manager during the Relevant Period and was responsible for overseeing LJM's portfolios and daily options trading of the mutual fund and commodity pool accounts. Caine was co-portfolio manager who discussed all portfolios with Parvataneni and LJM's portfolio managers on a regular basis. Caine had final say on portfolio risk.

**ANSWER:**     Defendants admit the allegations in sentences 1 and 3 and deny the

allegation in sentence 2 of paragraph 34.

35.     During the Relevant Period, LJM's primary investment strategy was a "short volatility strategy" in which LJM was a seller, or premium writer, of out-of-the-money put and call SP options. According to LJM, its primary strategy was to seek to realize profits when the value of SP options declined as a function of time, rather than a function of market direction.  In summary, LJM sold out-of-the money SP options with the goal of keeping them out of the money, usually by rolling them over to further out-of-the-money options, while collecting the premiums.

**ANSWER:**     Defendants admit the allegations of paragraph 35.

36.     LJM bought a limited amount of long call or put SP options for hedging purposes in its P&G and Moderately Aggressive strategies but its overall portfolio was net uncovered short put and call options.

**ANSWER:**     Defendants state that the allegation "LJM bought a limited amount of long

call or put SP options for hedging purposes" is vague and ambiguous and on that basis, the

allegations of paragraph 36 are denied.

37.     A commodity option buyer's risk is limited to the premium the buyer paid for the option. However, writing or selling put commodity options involves the risk for very large losses as the price of the underlying futures contract may fall to zero. Writing or selling uncovered (unhedged) call commodity options also carries the potential for unlimited losses as the price of the underlying futures contract may rise limitlessly. LJM was a writer or seller of net uncovered call and put SP options. In its Disclosure Document (a document describing the risks to pool participants), LJM stated selling options involves a risk of unlimited loss. The P&G mutual fund prospectus stated that losses are potentially large in a written put transaction and potentially unlimited in a written call transaction.

**ANSWER:**     Defendants admit the allegations in sentences 1 through 4 of paragraph 37.

Defendants note that the allegations in sentences 5 and 6 refer to written documents.  Defendants

refer to the written documents for more complete and accurate statements of their contents, and

to the extent the allegations in sentences 5 and 6 of paragraph 37 are not consistent with the referenced documents, Defendants deny the allegations.

38.     The P&G Fund applied the P&G strategy. The majority of LJM commodity pools applied the Moderately Aggressive strategy, although at least two pools managed by LJM Partners also applied the P&G strategy. The Aggressive strategy was employed for the separately-managed individual accounts.

**ANSWER:**     Defendants admit the allegations of paragraph 38.

39.     LJM primarily marketed their investment funds through Registered Investment Advisors ("RIAs") who acted as agents for prospective pool participants.

**ANSWER:**     Defendants admit the allegations of paragraph 39.

40.     During the Relevant Period, LJM marketed its investment opportunities via webinars, sales materials, Due Diligence Questionnaires ("DDQs"), emails, in-person meetings and telephone calls with RIAs.

**ANSWER:**     Defendants admit the allegations of paragraph 40.

41.     An example of LJM's sales materials was a 2017 sales brochure called "Investing in Volatility." This document included such statements as:
- Robust risk management and R&D systems;
- Senior level portfolio and risk management team has more than 50 years combined experience managing volatility strategies through an array of market conditions, including 2008;
- LJM seeks to profit primarily from the "volatility premium"—the difference between implied volatility (investors' forecast of market volatility reflected in options pricing) and realized (actual) market volatility;
- The LJM P&G strategy: a) trades options on S&P 500 futures, which are highly liquid and marked to market daily; b) is short volatility, i.e. LJM is a net seller of options, and c) trades out-of-the-money options with the goal of keeping them out of the money through small daily portfolio adjustments;
- LJM P&G strategy does not: a) take directional bets or engage in market timing; LJM is not trend following; and b) hold any underlying stocks; the strategy provides exposure to market volatility not market prices;
- LJM Fund's P&G strategy has performed well in markets that are flat, choppy, eroding, and slowly rising or falling;
- The LJM Fund P&G strategy will be challenged during sustained upward-trending equity markets, quick reversals, and extreme volatility spikes or market moves;
- LJM P&G strategy has low correlation to equities, fixed income, and other alternative strategies; and
- LJM's risk monitoring includes profit and loss [analysis], scenario analysis, risk

mitigation trades, and revenue-generating trades.

**ANSWER:** Defendants note that the allegations of paragraph 41 refer to a 2017 sales brochure titled "Investing in Volatility." Defendants refer to the 2017 sales brochure titled "Investing in Volatility" for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 41 are not consistent with the referenced document, Defendants deny the allegations.

42. LJM also provided any RIA who requested it a DDQ. The DDQs contained LJM's responses to due diligence questions explaining the nature of LJM's investment strategies, the track record, key personnel background, operational risk, portfolio risk management, and other information.

**ANSWER:** Defendants admit the allegation in sentence 1 of paragraph 42. Defendants note that the allegations in sentence 2 refer to written DDQs. Defendants refer to the written DDQs for more complete and accurate statements of their contents, and to the extent the allegations in sentence 2 of paragraph 42 are not consistent with the referenced DDQs, Defendants deny the allegations.

43. During the Relevant Period, Defendant Caine discussed and explained LJM's trading strategies in regular webinars to pool participants. Caine also had direct communications via telephone and/or emails with pool participants, or their RIA agents, to explain LJM's trading strategies and investor-related information. In 2017, Defendant Parvataneni began hosting the LJM webinars with another LJM employee.

**ANSWER:** Defendants admit the allegations in sentences 1 and 2 and deny the allegation in sentence 3 of paragraph 43.

44. During the Relevant Period, Defendant Parvataneni had telephone calls and in-person meetings with RIAs, as agents of pool participants, to explain LJM's trading strategies. In 2017, Parvataneni also signed monthly newsletters disseminated via email to pool participants updating them on investment results and discussing LJM's trading strategies and risk management.

**ANSWER:** Defendants admit the allegations in sentence 1 of paragraph 44. Defendants note that the allegations in sentence 2 refer to monthly newsletters. Defendants refer

11

to the monthly newsletters for more complete and accurate statements of their contents, and to the extent the allegations in sentence 2 of paragraph 44 are not consistent with the referenced newsletters, Defendants deny the allegations.

45.    LJM Partners provided each pool participant with a Disclosure Document. LJM Funds Management provided each mutual fund investor with a prospectus. Both documents contained certain boilerplate risk disclosures.

**ANSWER:**    Defendants admit the allegations in sentences 1 and 2 and deny the allegations in sentence 3 of paragraph 45.

### MISLEADING STATEMENTS ABOUT THE WORST-CASE SCENARIO

46.    In an email dated March 24, 2015, LJM's Chief Risk Officer ("CRO") wrote "we have a perfectly fine functioning Risk [sic] assessment practice, but have not yet integrated risk control into our trading practice. My guess is that would be diagnosed as an inadequately integrated risk culture, but good risk practice."

**ANSWER:**    Defendants note that the allegations of paragraph 46 refer to an email dated March 24, 2015. Defendants refer to the email dated March 24, 2015 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 46 are not consistent with the referenced email, Defendants deny the allegations.

47.    Defendants knew that prospective and existing pool participants were keenly focused on the risk of loss associated with their investment and LJM's management of that risk. In April 2016, Caine instructed LJM staff to "put a wrapper on a positive risk message and keep it consistent." In the months that followed, LJM crafted a Risk Frequently Asked Questions ("FAQ") document that was used by them to answer questions from prospective or existing pool participants, or their agents. It was an internal document that was not distributed to the public but was used by LJM staff to respond to any questions listed in the document.

**ANSWER:**    Defendants deny the allegation in sentence 1 of paragraph 47. Defendants note that the allegations in sentences 2 and 3 refer to written documents. Defendants refer to the written documents for more complete and accurate statements of their contents, and to the extent the allegations in sentences 2 and 3 of paragraph 47 are not consistent with the referenced documents, Defendants deny the allegations. Defendants admit the allegation in sentence 4 of

12

paragraph 47.

48.     Defendants Caine and Parvataneni were provided drafts of the Risk FAQs for their review before it was distributed to sales staff. Both Defendants knew that these FAQs were to be used by LJM's sales staff to assist them in answering the risk-related questions posed by prospective and existing pool participants.

**ANSWER:**     Defendants admit the allegations of paragraph 48.

49.     The RISK FAQ contained the following question and false answer:
**What is your worst-case scenario? How bad can it get?**
In the case of a market event so extreme that we are unable to trade (markets become illiquid or the breakers hit), **LJM estimates the worst-case daily loss as follows: Aggressive, 40%; Moderately Aggressive, 30%; and Preservation and Growth, 20%.**
NOTE: Worst-case loss is not the same as capital at risk. Investor's total capital is at risk; worst case loss is a daily loss estimate. (emphasis added).

**ANSWER:**     Defendants note that the allegations of paragraph 49 refer to the Risk

FAQ.  Defendants refer to the Risk FAQ for a more complete and accurate statement of its

contents, and to the extent the allegations of paragraph 49 are not consistent with the referenced

document, Defendants deny the allegations.

50.     Utilizing the Risk FAQ, LJM sales staff made oral statements to RIAs, as agents of pool participants, that the worst-case daily loss was an estimated 20% to 40%, depending on the strategy.

**ANSWER:**     Defendants admit the allegations of paragraph 50.

51.     LJM also sent some RIAs, as agents for prospective pool participants, a June 2016 DDQ containing answers to due diligence questions. Section 6 of this 2016 DDQ related to risk management questions. Question 6.22 contained the following question and false answer:
    "**What is the estimated maximum risk on the total portfolio?**"
LJM employs a combination of scenarios to estimate risk to the portfolio assuming no risk mitigating actions may be taken. This is reflective of "gap" or "overnight" risk to the portfolio. **The main basis of assumption is historical market behavior such as the immediate market movement when Lehman Bros. failed in 2008, the electronic market Flash Crash in 2010 and the S&P downgrade of US debt in 2011**. LJM calculates the effects of these market moves to formulate a worst-case expectation for loss.
LJM also assumes that it can maintain and manage portfolio risk during the course of regular trading. In this scenario, LJM assumes that it will hold certain portfolio risks at near constant levels for the market move assuming realization of

13

certain losses.

Finally, LJM breaks down the factors of loss, considering losses due to changes in underlying value and option volatility. LJM will attempt to strongly mitigate underlying value loss (delta and gamma exposure) while maintaining exposure to the implied volatility. Generally implied volatility is strongly mean reverting, but it is possible for very large movement.

**General worst-case losses can run in the order of 20% for P&G and 30-35% for more aggressive flavors of the strategy. Losses related to volatility account for most of these losses.**

For severe market movement but allowing for regular trading, LJM will maintain consistent delta, gamma and vega exposures. Generally, this projects to losses on the order of 5-10% for severe market movement for the given strategies where most of the losses are related to volatility. (emphasis added).

For example, on March 31, 2017, LJM sales representative P.M. emailed the June 2016 DDQ to an RIA that contained the misleading representation about worst-case losses. LJM disseminated the June 2016 DDQ to RIAs on at least 35 different dates.

**ANSWER:** Defendants admit the allegations in the first and last sentences of paragraph 51. Defendants deny the remaining allegations of paragraph 51 alleging that LJM provided "false answer[s]" and "misleading representation about worst-case losses." Defendants also note that the remaining allegations of paragraph 51 refer to the 2016 DDQ. Defendants refer to the 2016 DDQ for a more complete and accurate statement of its contents, and to the extent the remaining allegations of paragraph 51 are not consistent with the referenced document, Defendants deny the allegations.

52.     LJM's October 2017 Investment Management Questionnaire (a/k/a DDQ) also repeated the false claim that "[i]n the case of a market event so extreme that we are unable to trade (markets become illiquid or the breakers hit), LJM Partners estimates the worst-case daily loss as follows: Aggressive, 40%; Moderately Aggressive, 30%; and Preservation and Growth, 20%."

**ANSWER:** Defendants deny the allegations of paragraph 52.

53.     The FAQ and DDQ statements that LJM estimates the worst-case daily loss as 20-40% or 20-35%, depending on the strategy, were false and misleading. First, LJM did not calculate the effects of the market moves it cited (such as the S&P downgrade of US debt in 2011) to formulate a worst-case expectation for loss, as represented in its Risk FAQ and June 2016 DDQ. Instead, LJM's CRO, who drafted the relevant language here, obtained the 20 to 35-40% DDQ worst-case losses figures by taking LJM's own prior worst daily drawdown for each strategy, rounding it up, and then simply doubling the numbers. Even though LJM had auto-

generated scenario analyses based on historical market movements (i.e., 1987 Wall Street crash, the 2010 Flash Crash, the 2011 S&P downgrade of US debt) that indicated LJM would sustain daily losses in excess of 40%, the CRO ignored these reports when calculating the worst-case scenario figures in the Risk FAQ and June 2016 DDQ. Second, these auto-generated historical scenarios showed potential worst-case losses far in excess of 40% for all of LJM's strategies, thus the June 2016 DDQ misrepresented what LJM's historical scenarios actually showed.

**ANSWER:** Defendants deny the allegations of paragraph 53.

54. Internal communications demonstrate that LJM was reluctant to admit in direct communications with pool participants, or their agents, that potential losses could be very high from LJM's short options trading strategies. In an email dated December 19, 2017, E.B. (an LJM associate portfolio manager who reported to Caine and Parvataneni), wrote in response to a client question asking what the maximum loss was: **"Should we openly disclose 100% as the maximum loss?"** In response, LJM's former marketing manager expressly wrote that such information should not be in an email but left to a telephone call.

**ANSWER:** Defendants deny the allegations in sentence 1 of paragraph 54. Defendants note that the allegations in sentences 2 and 3 refer to emails. Defendants refer to the emails for more complete and accurate statements of their contents, and to the extent the allegations in sentences 2 and 3 of paragraph 54 are not consistent with the referenced documents, Defendants deny the allegations.

55. In an internal April 2016 email, responding to a question from LJM salesperson P.M. about what were the maximum drawdowns in P&G and Moderately Aggressive strategies, Defendant Caine admitted: **"In extreme cases, theoretically we model to 100% loss."** (emphasis added). However, this information was never disclosed to pool participants in writing.

**ANSWER:** Defendants note that the allegations of paragraph 55 refer to an April 2016 email. Defendants refer to the April 2016 email for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 55 are not consistent with the referenced email, Defendants deny the allegations.

56. Defendants knowingly or recklessly misrepresented the results of LJM's historical scenario analyses by stating the worst-case daily loss was 20-40% (or 20-35%) depending on the strategy. The LJM employees and agents who drafted and approved the false and misleading statements in the Risk FAQ and DDQs about the worst-case scenario and who made oral and written representations about the worst-case scenario to prospective and existing pool participants, or their agents, did so in the course of their employment or office.

15

**ANSWER:**     Defendants deny the allegations of paragraph 56.

## MISREPRESENTATIONS OR OMISSIONS
## ABOUT LJM'S RISK MANAGEMENT

57.     During the Relevant Period, LJM sales and marketing staff also made misleading and inaccurate statements about LJM's risk management that oversold its ability to manage the risk exposure of the LJM portfolios and implied an ability to mitigate, if not avoid losses. LJM falsely told prospective and existing pool participants that LJM conducted and used historical scenario stress tests as part of its risk management process.

**ANSWER:**     Defendants deny the allegations of paragraph 57.

58.     For example, in a sales brochure and sales presentations, LJM stated that it had "robust risk management and R&D systems" and that LJM's investment philosophy included "volatility strategies with an emphasis on proper risk management" with scenario analysis and stress testing.

**ANSWER:**     Defendants note that the allegations of paragraph 58 refer to written documents.   Defendants refer to the written documents for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 58 are not consistent with the referenced documents, Defendants deny the allegations.

59.     In the June 2016 DDQ, LJM stated that it uses real time "what-if" scenario analysis to optimize execution of hedge positions and that LJM "employs a combination of scenarios to estimate risk to the portfolio assuming no risk mitigation actions may be taken."

**ANSWER:**     Defendants note that the allegations of paragraph 59 refer to the June 2016 DDQ.  Defendants refer to the June 2016 DDQ for more complete and accurate statements of its contents, and to the extent the allegations of paragraph 59 are not consistent with the referenced document, Defendants deny the allegations.

60.     In a December 2016 DDQ sent to a large bank for consideration in the bank's alternative investments platform, LJM represented that:

> The fund runs reports using current market data throughout the trading day to monitor portfolio risk given **various historical (e.g. 2011 S&P Downgrade, etc.) scenarios** along with several parametric (market changes by x%, etc.) scenarios. These assessments measure the impact of market changes on the portfolio assuming instantaneous change and no adjustments to the portfolio. Review of this scenario analysis is incorporated into the fund's daily risk management and

16

trading process. (emphasis added)

**ANSWER:** Defendants note that the allegations of paragraph 60 refer to the December 2016 DDQ. Defendants refer to the December 2016 DDQ for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 60 are not consistent with the referenced document, Defendants deny the allegations.

61.     In its September 1, 2017, annual report to the P&G Fund board of trustees, LJM represented its risk management consisted of several analyses including "reports that show portfolio performance given extreme market movements based, in part, on real historical data and also on other extreme combinations."

**ANSWER:** Defendants note that the allegations of paragraph 61 refer to the September 1, 2017 annual report. Defendants refer to the September 1, 2017 annual report for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 61 are not consistent with the referenced document, Defendants deny the allegations.

62.     In April 2016, in a webinar broadcast to RIAs and pool participants, Defendant Caine proclaimed "LJM models the probability of previous events, and adjusts portfolio to accommodate these events."

**ANSWER:** Defendants note that the allegations of paragraph 62 refer to the April 2016 webinar. Defendants refer to the April 2016 webinar for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 62 are not consistent with the referenced webinar, Defendants deny the allegations.

63.     In reality, LJM did not actually use scenario analysis (given various historical scenarios, e.g. 2011 S&P Downgrade, etc.) as part of its portfolio risk management. LJM auto-generated such historical scenarios but LJM's portfolio managers, including Parvataneni and Caine, did not use them in risk management.

**ANSWER:** Defendants deny the allegations of paragraph 63.

64.     According to Parvataneni, for risk management LJM used standard Greek risk metrics, Break-Even reports which forecasted profits and losses, and CQG reports, which were options position reports from the execution brokers. Parvataneni never used the historical scenarios described in LJM 's DDQs and reports to the P&G Fund board of trustees.

17

**ANSWER:** Defendants admit the allegations in sentence 1 and deny the allegations in sentence 2 of paragraph 64.

65. In addition, LJM represented to prospective and existing pool participants that it utilized standard Greek risk metrics when measuring options risk. For instance, during LJM's 2017 First Quarter webinar, Caine touted LJM's "discipline" and "strict adherence to risk metrics" specifically referencing LJM's use and analysis of the Greek risk metrics vega, delta and gamma in risk management. However, in actuality, LJM ignored or paid little attention to vega, which is a measure of options volatility risk. That is because LJM portfolio managers and staff, including Caine and Parvataneni, said that vega/volatility was historically mean reverting and that losses would be recoverable in time. Indeed, during sworn testimony, Parvataneni testified: "Q. Did the fund do anything to limit its vega risk? A. No.".

**ANSWER:** Defendants admit the allegation in sentence 1 of paragraph 65. Defendants note that the allegations in sentences 2 and 5 refer to a webinar and sworn testimony. Defendants refer to the webinar and sworn testimony for more complete and accurate statements of their contents, and to the extent the allegations in sentences 2 and 5 of paragraph 65 are not consistent with the referenced webinar and sworn testimony, Defendants deny the allegations. Defendants deny the allegations in sentences 3 and 4 of paragraph 65.

66. LJM's portfolio management team did nothing to limit vega/volatility risk and Parvataneni testified that: "The idea was vega losses typically being reverting. That was the whole tenet and part of the strategy…And that mean reversion is a core tenet of the strategy." Parvataneni also testified: "Q. So, there was no steps taken to minimize volatility moves, moves in volatility? A. Time will solve the problem." The fact that LJM did nothing to limit vega/volatility risk was never disclosed in writing to prospective or existing pool participants. Caine also testified that "We do know that vega is mean reverting …"

**ANSWER:** Defendants deny the allegation in sentence 1 of paragraph 66 that the LJM portfolio management team did nothing to limit vega/volatility risk. Defendants note that the remaining allegations of paragraph 66 refer to the sworn testimonies of Parvataneni and Caine. Defendants refer to the sworn testimonies of Parvataneni and Caine for more complete and accurate statements of their testimonies, and to the extent the remaining allegations of paragraph 66 are not consistent with the referenced sworn testimonies, Defendants deny the allegations.

67. Defendants knew that LJM did not use historical scenarios in risk management and that the portfolio managers did not account for or paid little attention to vega/volatility risk because of LJM's belief that volatility is always mean reverting. Without proper risk management, the risk of selling options is heightened.

**ANSWER:** Defendants deny the allegations in sentence 1 and admit the allegations in sentence 2 of paragraph 67.

68. These representations about robust risk management with historical scenarios analysis were false and misleading.

**ANSWER:** Defendants deny the allegations of paragraph 68.

69. Likewise, LJM's decision to ignore vega/volatility risk when trading options shows that LJM did not have the robust, prudent, or sophisticated risk management that it touted to pool participants. These facts ran counter to LJM's touted claims of "robust" risk management as a key component of its trading. As documented in an email sent to LJM on February 9, 2018, in the days following the collapse of LJM's portfolio, an investment advisor for pool participants wrote, he was "walked through the risk parameters in place to ensure something like this never happens. Furthermore, was assured it wouldn't and couldn't happen." The email identified Defendant Parvataneni as among the LJM staff participating in that conversation.

**ANSWER:** Defendants deny the allegations in sentences 1 and 2 of paragraph 69. Defendants note that the remaining allegations of paragraph 69 refer to an email dated February 9, 2018. Defendants refer to the email dated February 9, 2018 for a more complete and accurate statement of its contents, and to the extent the remaining allegations of paragraph 69 are not consistent with the referenced email, Defendants deny the allegations.

70. LJM's officials, agents, employees, or other persons acting for or on behalf of LJM who made the aforementioned false or misleading statements alleged herein did so within the scope of their employment or office.

**ANSWER:** Defendants deny the allegations of paragraph 70.

## MISREPRESENTATIONS OR OMISSIONS
## ABOUT CHANGES TO LJM'S RISK PROFILE

71. Additionally, LJM, through misleading statements and material omissions, misled its investors about the risk profile of its portfolio.

**ANSWER:** Defendants deny the allegations of paragraph 71.

72.    LJM touted to its investors that it maintained a consistent risk profile. Throughout 2017 LJM's monthly and quarterly newsletters, signed by Parvataneni, to pool participants made claims such as "[t]he Investment Management team makes small daily portfolio additions and adjustments…with the goal of maintaining a consistent risk reward profile;" and "[i]ncremental adjustments were made to positions…with the goal of maintaining consistent risk profiles." Moreover, LJM claimed that in low volatility environments, like those being experienced in 2017, the LJM Investment Management team reacted quickly to market moves "in order to maintain consistent risk levels in the portfolio." These claims were repeated in 2017 quarterly newsletters issued by LJM Funds Management and signed by Parvataneni.

**ANSWER:**    Defendants state that the use of the word "touted" in sentence 1 of paragraph 72 is vague and ambiguous and on that basis, Defendants deny the allegation in sentence 1.  Defendants note that the remaining allegations of paragraph 72 refer to 2017 LJM monthly and quarterly newsletters.  Defendants refer to the 2017 LJM monthly and quarterly newsletters for more complete and accurate statements of their contents, and to the extent the remaining allegations of paragraph 72 are not consistent with the referenced documents, Defendants deny the allegations.

73.    However, beginning in late 2017, the risk profile of the LJM portfolios began a trend of diverging from its traditional characteristics. By December 2017, the risk profile of the LJM portfolios, unbeknownst to the LJM pool participants, had significantly deviated from their traditional norms. The portfolio's Greek risk metrics no longer tracked its historic profiles and the portfolio was demonstrably different in various standard metrics, such as the delta, vega and gamma, as well as in its response to stress test scenarios.

**ANSWER:**    Defendants deny the allegations of paragraph 73.

74.    In an email dated November 17, 2017, Caine asks Parvataneni if he is taking a "directional bias." In an email dated December 27, 2017, Caine wrote to LJM associate portfolio manager, E.B., that "I actually am a bit scared of the main portfolios. They maintain a directional bias."

**ANSWER:**    Defendants note that the allegations of paragraph 74 refer to emails. Defendants refer to the emails for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 74 are not consistent with the referenced emails, Defendants deny the allegations.

20

75.    While the LJM's portfolio historically maintained a negative delta, by December of 2017, the delta of LJM's portfolio had shifted from a typically negative number to consistently positive. End of day positions show, for instance, between May 1, 2017 and November 30, 2017—132 trading days—that LJM had two days where its end of day positions in the account used to trade the P&G strategy was delta positive. However, in the 42 trading days spanning December 1, 2017, through February 5, 2018, the account's end of day delta was positive for 33 of those 42 days. The mean delta of the P&G strategy account was -36.5 for the first nine months of 2017, and -33.5 between October and November 2017. The mean delta of the portfolio jumped to 19.2 in December 2017 and 18.4 in January 2018.

**ANSWER:**    Defendants deny the allegations of paragraph 75.

76.    Conversely, the P&G account's vega numbers, began decreasing throughout December 2017 before dramatically spiking downward in January 2018. Mean vega became increasingly negative in December 2017 and January 2018, reaching -91 in December and -132 in January. Vega in the P&G account had not been less than -100 for the first nine months in 2017. However, between October and December 2017 the P&G account recorded eight days where vega was less than -100 between October and December 2017, and from January 11, through February 5, 2018, vega was less than -100 each day through February 5, 2018.

**ANSWER:**    Defendants deny the allegations of paragraph 76.

77.    Similarly, the P&G account's gamma numbers, began trending to the negative starting in mid-2017 with a sharp decline in January 2018. Mean gamma became increasingly negative in December 2017 and January 2018, reaching -75 in December 2017 and -90 in January 2018. Furthermore, gamma was less than -90 on four days in the first nine months of 2017, nine days in the last three months of 2017, and eleven days in January 2018.

**ANSWER:**    Defendants deny the allegations of paragraph 77.

78.    Moreover, the portfolio was positioned in a manner that essentially doubled the size of potential losses associated with a significant drop in the S&P and an upward spike in volatility, compared to the historic profile of LJM's positions. This was the result of LJM increasing the number of options per equity dollar in the portfolio in late 2017 and early 2018 while also increasing the percentage of short puts and decreasing the percentage of short calls and long puts. This change to the portfolio left the portfolio at risk for greater losses if volatility spiked upward and the price of the S&P dropped.

**ANSWER:**    Defendants deny the allegations of paragraph 78.

79.    None of these changes were disclosed to pool participants. Rather, they were led to believe that LJM was maintaining and moving forward with the consistent risk profile that it had historically maintained. In a newsletter dated December 6, 2017, signed by Parvataneni, LJM claimed "[a]s markets moved, the Investment Management team adjusted portfolios to *maintain the consistent risk profiles our clients expect.*" [emphasis added]. Moreover, one month later, a newsletter dated January 6, 2018, signed by Parvataneni, continued this false narrative

21

claiming that in 2017 "LJM's Investment Management team delivered consistent returns while maintaining long-term risk parameters" and that it would "manage portfolios with continued focus on harnessing the spread between implied and realized volatility while maintaining consistent risk levels." LJM and Parvataneni not only failed to disclose to its pool participants that the risk profile had deviated dramatically from its historical norms, but the language of its outgoing LJM newsletters misleadingly represented that LJM would manage portfolios while maintaining consistent risk levels.

**ANSWER:** Defendants deny the allegations in sentences 1, 2, 4 and 5 of paragraph 79. Defendants note that the allegation in sentence 3 refer to LJM newsletters dated December 6, 2017 and January 6, 2018. Defendants refer to the LJM newsletters dated December 6, 2017 and January 6, 2018 for complete and accurate statements of their contents, and to the extent the allegation in sentence 3 of paragraph 79 are not consistent with the referenced newsletters, Defendants deny the allegation.

## DEFENDANT CAINE'S CONTROLLING PERSON LIABILITY

80.     Defendant Caine is the Chairman, founder and owner of LJM. Caine was also the co-portfolio manager and sat on LJM's risk committee. Caine had the authority to hire and fire employees. Caine had the authority to review the work of all LJM employees, including LJM Chief Portfolio Manager Parvataneni and the CRO, and determined their salaries and bonuses. Caine was listed as a principal of LJM in National Futures Association ("NFA") records and was also a registered AP of LJM. Caine had final say on portfolio risk and decades of experience trading options and managing options portfolios.

**ANSWER:** Defendants admit the allegations of paragraph 80.

81.     Caine was provided a copy of the Risk FAQ in June 2016 that contained the representations that LJM estimated the worst-case daily loss as 20-40%, depending on the strategy. Caine was regularly provided copies of LJM marketing materials that sales staff provided to RIAs and prospective investors. These marketing materials contained representations about LJM's robust risk management and scenario analysis. Caine also had access to the DDQs which contained the false representation about worst-case daily losses being 20-35%, depending on the strategy, as determined by LJM's historical scenarios.

**ANSWER:** Defendants admit the allegations in sentences 1 and 3 and deny the allegations in sentences 2 and 4 of paragraph 81.

82.     As co-portfolio manager, Caine also knew or was constructively aware that the LJM portfolio team ignored or paid little attention to vega risk because of assumptions that

22

vega/volatility losses were always mean reverting. Caine testified to CFTC staff that "[w]e do know that vega is mean reverting and over time vega has a reduced implication on the portfolio. So we could be more patient with vega losses than we could with losses associated with delta."

**ANSWER:** Defendants deny the allegations in sentence 1 of paragraph 82. Defendants note that the remaining allegations in sentences 2 and 3 refer to sworn testimony. Defendants refer to the sworn testimony for a more complete and accurate statement of its content, and to the extent the allegations contained in sentences 2 and 3 of paragraph 82 are not consistent with the sworn testimony, Defendants deny the allegations.

83.    As a member of LJM's Risk Committee and a co-portfolio manager, Caine knew or was constructively aware that LJM did not utilize historical scenarios and that, therefore, LJM did not have the robust risk management it touted in its marketing materials.

**ANSWER:** Defendants deny the allegations of paragraph 83.

84.    Caine received copies of LJM's monthly and quarterly newsletters and updates. As co-portfolio manager, Caine monitored LJM's entire portfolio and had regular discussions with Parvataneni and the portfolio team about the portfolio. Furthermore, according to the LJM Risk Policy, "At LJM, ownership has the final say on risk." Thus, Caine knew or was constructively aware that LJM's risk profile had significantly deviated in late 2017 and early 2018, as alleged above, and was more vulnerable to a spike in volatility. Despite his knowledge and authority, Caine did nothing to prevent or correct LJM's false and misleading statements to pool participants about maintaining consistent risk profile in late 2017 and early 2018.

**ANSWER:** Defendants admit the allegations in sentences 1 and 2 of paragraph 84. Defendants deny the allegations in sentences 4 and 5 of paragraph 84. Defendants note that the allegation in sentence 3 refer to the LJM Risk Policy. Defendants refer to the LJM Risk Policy for a more complete and accurate statement of its contents, and to the extent the allegation in sentence 3 of paragraph 84 are not consistent with the referenced document, Defendants deny the allegation.

85.    Thus, Caine as a controlling person of LJM, knowingly induced, or did not act in good faith with respect to, the false and misleading statements described herein that LJM made to prospective and existing pool participants.

**ANSWER:** Defendants deny the allegations of paragraph 85.

## SUPERVISION FAILURES

86.     During the Relevant Period, LJM Partners Ltd. and LJM Funds Management Ltd. were registered with the Commission as CPOs. Caine is a registered AP of both LJM entities and their Chairman and had supervisory responsibilities over LJM staff.

**ANSWER:**     Defendants admit the allegations of paragraph 86.

87.     As registrants with supervisory duties, Defendants LJM and Caine each had a duty to diligently supervise its officers, employees and agents.

**ANSWER:**     Paragraph 87 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

88.     LJM sales staff made multiple false and misleading statements in emails to prospective pool participants, or their agents, that were contradictory to the actual operation of LJM and its strategies.

**ANSWER:**     Defendants deny the allegations of paragraph 88.

89.     As described above, LJM sales staff represented to some prospective and existing pool participants, or their agents, that (a) the worst-case daily loss was 20% to 35-40% depending on the strategy and (b) LJM utilized historical scenario analysis as part of its portfolio risk management. As explained above, these statements were false and misleading.

**ANSWER:**     Defendants deny the allegations of paragraph 89.

90.     Moreover, LJM's claims of "robust" risk management were undercut by LJM's failure to comply with its own risk policy. The LJM Risk Policy that was in effect between March 2013 and September 2016 required the firm to hold bi-monthly Risk Committee meetings and maintain agendas and minutes for said meetings. In the 30 months spanning March 2013 through September 2016 LJM held four such meetings, one in 2013, two in 2014, one in 2015 and none in 2016. While LJM maintained a meeting agenda for its 2015 meeting there are no minutes of that meeting. LJM failed to comply with its own Risk Policy for the period of March 2013 through September 2016.

**ANSWER:**     Defendants deny the allegations in sentences 1, 2 and 5 and admit the

allegations in sentences 3 and 4 of paragraph 90.

91.     LJM sales staff made inaccurate and incomplete statements via email to existing and prospective pool participants, or their agents, that the LJM strategy was "rules-based" and utilized "rules-based portfolio management." A rules-based trading system is typically defined as a system of trading which precisely defines a trade set-up, determines exactly how much money will be placed on the trade (position size), as well as what the risk and profit will be. However,

24

LJM actually operated "discretionary" based trading parameters.

**ANSWER:**    Defendants deny the allegations in sentence 1 and admit the allegations in

sentences 2 and 3 of paragraph 91.

92.    In January 2018, LJM sales staff told prospective and existing P&G Fund investors/pool participants, or their agents, that LJM maintained a "delta negative" portfolio. Delta is the option's equivalent of a position in the underlying financial instrument so positive delta means that you are bullish the market and a negative delta means that you are bearish the market. At least one LJM salesperson sent over forty emails to existing and prospective pool participants or their agents touting the fund's "delta negative" nature when the fund's profile was delta positive and had been consistently delta positive for almost two months (December 2017 to mid-January 2018). These representations were an inaccurate portrayal of the LJM strategy because the P&G portfolio became consistently delta positive from December 2017 through January 2018. Moreover, in the weeks following these emails, LJM's portfolio remained consistently positive delta until LJM's collapse in February 2018.

**ANSWER:**    Defendants deny the allegations in sentences 1, 2, 4 and 5 of paragraph 92.

Defendants note that the allegations in sentence 3 refer to emails.  Defendants refer to the emails

for more complete and accurate statements of their contents, and to the extent the allegations in

sentence 3 of paragraph 92 are not consistent with the emails, Defendants deny the allegations.

93.    Defendants LJM and Caine failed to take adequate steps to deter or correct the aforementioned misrepresentations and inaccurate statements by LJM employees and agents. Neither LJM and Caine took adequate steps to prevent or correct misrepresentations to RIAs and/or pool participants that the worst-case daily loss was 20-40% depending on the strategy. Neither Caine nor LJM took effective steps to make sure the portfolio managers actually used historical scenarios as part of risk management as was represented to RIAs and pool participants. Neither LJM nor Caine took adequate steps to prevent or correct misstatements in LJM's newsletters to pool participants about maintaining a consistent risk profile when it had deviated significantly in late 2017 and early 2018. Nor did LJM and Caine take adequate steps to prevent or correct the inaccurate steps by sales representatives about LJM's strategy being "rules-based" and "delta negative."

**ANSWER:**    Defendants deny the allegations of paragraph 93.

94.    By, among other things, allowing LJM sales staff to make the inaccurate and misleading statements described herein and failing to comply with its own Risk Policy, Defendants LJM and Caine failed to diligently supervise their officers, employees and agents.

**ANSWER:**    Defendants deny the allegations of paragraph 94.

25

## VIOLATIONS OF THE CEA AND REGULATIONS
### Count One
### Violation of Section 4*o*(1)(A)-(B) of the CEA, 7 U.S.C. § 6*o*(1)(A)-(B) (2018)
### (Against All Defendants)

95.     7 U.S.C. § 6o(1)(A)-(B) (2018), make it unlawful for a CPO or CTA, or AP of CPO or CTA, to use the mails or any means or instrumentality of interstate commerce to: (A) to employ any device, scheme, or artifice to defraud any client or pool participant or prospective client pool participant; or (B) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or pool participant or prospective client or pool participant.

**ANSWER:**    Paragraph 95 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

96.     During the Relevant Period, as set forth by paragraphs 1 through 85 above, Defendants LJM Funds Management, a CPO, LJM Partners, a CPO and CTA, and Parvataneni, an AP of both LJM entities, directly or indirectly, (a) employed a device, scheme, or artifice to defraud clients or pool participants or prospective clients and pool participants; and/or (b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon prospective or existing clients or pool participants, in violation of 7 U.S.C. § 6o(1)(A)-(B). In particular, Defendant LJM intentionally or recklessly made false or misleading statements or omissions of material fact to prospective and existing pool participants, or their RIA agents, or engaged in transactions, practices and course of business that operated a fraud deceit upon pool participants, including: (a) "[g]eneral worst-case losses can run in the order of 20% for P&G and 30-35% for more aggressive flavors of the strategy" (as stated in the June 2016 DDQ) as calculated from historical scenario analysis, when it was not actually based on historical scenarios and LJM's auto-generated historical scenarios actually showed worst-case losses would be much higher; and (b) that LJM had robust, prudent risk management that utilized historical scenario analysis, when in fact, LJM did not use historical scenario analysis in risk management. In addition, Defendant LJM failed to disclose in writing that it ignored the impact of vega or volatility risk in risk management and that it failed to comply with its own internal Risk Policy. Moreover, these misleading statements or omissions combined to a create a false and misleading depiction of LJM and its strategy to prospective and existing pool participants and clients, or their RIA agents, overstating LJM's risk management while understating the risk of loss.

**ANSWER:**    Defendants deny the allegations of paragraph 96.

97.     Additionally, Defendants LJM and Parvataneni failed to disclose that the risk profile of LJM's portfolio had changed, after repeatedly touting to pool participants that it maintained a consistent risk profile, in violation of 7 U.S.C. § 6o(1)(A)-(B). LJM and Parvataneni misrepresented that LJM continued to maintain a risk profile that was consistent with its historical norm when in fact in late 2017 it began to deviate from that profile. By December 2017 through February 2018, LJM had significantly deviated from its historical risk profile, in that delta had moved from negative to consistently positive, vega decreased, gamma

26

decreased and the portfolio's vulnerability to loss in certain scenarios more than doubled, as described earlier. LJM's and Parvataneni's false or misleading statements and omissions gave pool participants a false impression of the construction of the LJM portfolio and the risk of loss associated with it.

      **ANSWER:**    Defendants deny the allegations of paragraph 97.

     98.    The false and misleading statements and omissions made by the officials, employees, agents, or other persons acting for or on behalf of LJM, including LJM's APs, were made within the scope of each such person's employment or office. Therefore, LJM is liable for each such person's false or misleading statements or omissions and violations of 7 U.S.C. § 6*o*(1)(A)-(B), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2020).

      **ANSWER:**    Defendants deny the allegations of paragraph 98.

     99.    Defendant Caine was the founder, Chairman, owner and co-portfolio manager of LJM, and possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of LJM. LJM's Risk Policy stated that the owner, Caine, had final say on portfolio risk. As such, Caine controlled LJM and had authority over LJM's portfolio and risk management during the Relevant Period and did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting LJM's violations of the CEA and Regulations. Accordingly, Caine is liable for LJM's violations of 7 U.S.C. § 6*o*(1)(A)-(B), pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2018).

      **ANSWER:**    Defendants admit the allegations in sentence 1 and deny the allegations in sentences 3 and 4 of paragraph 99. Defendants note that the allegations in sentence 2 refer to LJM's Risk Policy. Defendants refer to the LJM Risk Policy for a more complete and accurate statement of its contents, and to the extent the allegations in sentence 2 of paragraph 99 are not consistent with the LJM Risk Policy, Defendants deny the allegation.

     100.    Each misrepresentation or omission of material fact by Defendants, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

      **ANSWER:**    Defendants deny the allegations of paragraph 100.

**Count Two**
**Violations of Section 4c(b) of the CEA, 7 U.S.C. § 6c(b) and Regulation 33.10,**
**17 C.F.R. § 33.10 (2020)**
**(Against All Defendants)**

     101.    As set forth above in paragraphs 1 through 85, Defendants LJM and Parvataneni knowingly or recklessly made false and misleading statements to other persons in connection

27

with commodity options transactions.

**ANSWER:** Defendants deny the allegations of paragraph 101.

102. 7 U.S.C. § 6c(b) states that no person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

**ANSWER:** Paragraph 102 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

103. 17 C.F.R. § 33.10 states it shall be unlawful for any person directly or indirectly:
(a) To cheat or defraud or attempt to cheat or defraud any other person;
(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;
(c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

**ANSWER:** Paragraph 103 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

104. As set forth above, Defendant LJM knowingly or recklessly made false and misleading statements to other persons in connection with LJM's commodity options transactions, including: (a) "[g]eneral worst-case losses can run in the order of 20% for P&G and 30-35% for more aggressive flavors of the strategy" (as stated in the June 2016 DDQ) as calculated from historical scenario analysis, and (b) that LJM had robust, prudent risk management that utilized historical scenario analysis, when in fact, LJM did not use historical scenarios in risk management. In addition, Defendants LJM and Parvataneni knowingly or recklessly made false and misleading statements to other persons, in connection with commodity option transactions, that LJM maintained a "consistent risk profile" in late 2017 and early 2018 when, in fact, LJM's options portfolio risk profile had significantly deviated from its historical risk profile. As a result, Defendants LJM and Parvataneni violated 17 C.F.R. § 33.10.

**ANSWER:** Defendants deny the allegations of paragraph 104.

105. Defendant Caine was the founder, Chairman, owner and co-portfolio manager of LJM, and possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of LJM. LJM's Risk Policy stated that the owner, Caine, had final say on portfolio risk. As such, Caine controlled LJM and had authority over LJM's portfolio and risk management during the Relevant Period and did not act in good faith

28

with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting LJM's violations of the CEA and Regulations. Accordingly, Caine is liable for LJM's violations of 17 C.F.R. § 33.10 pursuant to 7 U.S.C. § 13c(b).

**ANSWER:** Defendants admit the allegations in sentences 1 and 2 and deny the allegations in sentences 3 and 4 of paragraph 105.

106. Each misrepresentation or omission of material fact by Defendants, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 33.10.

**ANSWER:** Defendants deny the allegation of paragraph 106 that Defendants made any misrepresentations or omissions of material fact or violated 17 C.F.R. § 33.10.

**Count Three**
**Violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018) and Regulation 180.1(a),**
**17 C.F.R. § 180.1(a) (2020)**
**(Against All Defendants)**

107. 7 U.S.C. § 9(1) (2018) makes it unlawful for any person, directly or indirectly, to: use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate …
Promulgated under 7 U.S.C. § 9(1) (2018), 17 C.F.R. § 180.1(a) provides:
It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit on any person.

**ANSWER:** Paragraph 107 asserts a legal conclusion and not an allegation against Defendants, and as such no response is required.

108. A person violates 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 if he or she: (1) engages in prohibited conduct (i.e., employs a fraudulent scheme, makes material misrepresentations or omissions, or engages in fraudulent business practices); (2) in connection with the sale of a

29

contract for sale of any commodity in interstate commerce; (3) with scienter. Defendants LJM and Parvataneni's false and misleading statements described above in paragraphs 1 through 85 above about (a) "[g]eneral worst-case losses can run in the order of 20% for P&G and 30-35% for more aggressive flavors of the strategy" (as stated in the June 2016 DDQ) as calculated from historical scenario analysis, (b) employing historical scenarios in risk management, and (c) maintaining a consistent risk profile in late 2017 and early 2018, in connection with contracts of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity (S&P Futures contracts, and the options thereon, trade on the CME, a designated contract market and registered entity pursuant to the Act), violated 7 U.S.C. § 9(1) and 17 C.F.R. 180.1.

**ANSWER:** Paragraph 108 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

109. Defendant Caine was the founder, Chairman, owner and co-portfolio manager of LJM, and possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of LJM. As such, Caine controlled LJM and had authority over LJM's portfolio and risk management during the Relevant Period and did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting LJM's violations of the CEA and Regulations. Accordingly, Caine is liable for LJM's violations of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1.

**ANSWER:** Defendants admit the allegation in sentence 1 and deny the allegations in

sentences 2 and 3 of paragraph 109.

110. Each misrepresentation or omission of material fact by Defendants, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1.

**ANSWER:** Defendants deny the allegations of paragraph 110.

**Count Four**
**Failure to Supervise in Violation 17 C.F.R. § 166.3 (2020)**
**(Against Defendants LJM and Caine)**

111. Pursuant to 17 C.F.R. § 166.3, "each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents . . . of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents . . . relating to its business as a Commission registrant."

**ANSWER:** Paragraph 111 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

30

112.     During the Relevant Period, as set forth above in paragraphs 1 through 94, LJM Partners, LJM Funds Management and Caine, knew or had reason to know that their principals, employees and agents were making the false and misleading and inaccurate statements alleged herein concerning LJM's trading strategies and risk management. LJM, as a registered CPO, and Caine, as a registered AP with supervisory duties, failed to take adequate steps to prevent or correct the misrepresentations and inaccurate statements made by LJM employees and agents to RIAs and prospective/existing pool participants as described herein. Thus, LJM and Caine failed to diligently perform their supervisory duties. These failures violated 17 C.F.R. § 166.3.

**ANSWER:**     Defendants deny the allegations of paragraph 112.

## AFFIRMATIVE DEFENSES

Defendants repeat, reallege, and incorporate herein by reference their responses to the allegations of Paragraphs 1 through 112 of the Complaint and assert the following affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE
### (Statute of Limitations)

The CFTC's claims against Defendants are barred in whole or in part by the applicable statute of limitations, including 28 U.S.C. § 2462.

## SECOND AFFIRMATIVE DEFENSE
### (Good Faith Reliance on Advice of Expert Professionals)

The CFTC's claims against Defendants fail in whole or in part because Defendants, in allegedly doing the acts complained of, relied in good faith upon the information, opinions, advice, reports, or statements made by attorneys, certified public accountants, auditors, and other expert professionals.

## THIRD AFFIRMATIVE DEFENSE
### (Statements Made in Good Faith)

The CFTC's claims against Defendants fail in whole or in part because the alleged misstatements were made in good faith, in the belief that such statements were accurate, that there was no omission of a material fact required to be disclosed or necessary to make any such

31

statements not misleading, and that such statements were proper in all respects.

### FOURTH AFFIRMATIVE DEFENSE
#### (Lack of Scienter)

The CFTC's claims against Defendants fail in whole or in part because they did not act with the state of knowledge or intent necessary to give rise to liability. No act or omission of Defendants was malicious, willful, wanton, reckless or made with intent to violate any statute or law. Defendants acted at all relevant times in good faith, without scienter, and without actual knowledge that any of the alleged statements or omissions were false or misleading.

### FIFTH AFFIRMATIVE DEFENSE
#### (No Fraudulent Conduct)

The CFTC's claims against Defendants fail in whole or in part because they never obtained money or property by means of knowingly or negligently making or using untrue statements of material fact and/or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

### SIXTH AFFIRMATIVE DEFENSE
#### (No Materiality)

The CFTC's claims against Defendants fail in whole or in part because any alleged false statements, omissions or claims were immaterial.

### SEVENTH AFFIRMATIVE DEFENSE
#### (Compliance with Laws)

The CFTC's claims against Defendants fail in whole or in part because Defendants conduct was in compliance with, or authorized by, laws or regulations administered by a regulatory body or officer acting under state or federal statutory authority.

### EIGHTH AFFIRMATIVE DEFENSE
#### (Acts by Third Parties)

The CFTC's claims against Defendants fail in whole or in part because the occurrences

alleged in the Complaint and all Losses alleged, including those at paragraphs 4 and 6 of the Complaint, if any, resulting therefrom were caused by the acts or omissions of third parties over whom Defendants had no control, including, but not limited to, market forces. Defendants conduct was not the proximate cause of any of the investor losses alleged by the CFTC.

## NINTH AFFIRMATIVE DEFENSE
### (Information from Other Sources)

The CFTC's claims against Defendants fail in whole or in part because any alleged false or misleading statements referenced in the Complaint were based on information supplied by other sources, which information Defendants believed to be true.

## TENTH AFFIRMATIVE DEFENSE
### (No Likelihood of Future Violations)

The CFTC's claim for injunctive relief is unavailable because (a) there has been no violation of the commodities laws, (b) any violations of law that may have occurred were technical in nature, and (c) there is no likelihood of any future violations of applicable commodities law. Thus, the CFTC cannot establish that there is a reasonable likelihood that Defendants would violate the commodities laws in the absence of injunctive relief.

## ELEVENTH AFFIRMATIVE DEFENSE
### (No Ill-Gotten Gains)

The CFTC's claim for disgorgement should not be granted because Defendants did not receive profits, ill-gotten gains or any form of pecuniary benefit that was derived from the alleged misconduct.

## TWELFTH AFFIRMATIVE DEFENSE
### (No Duty to Disclose)

The CFTC's claims against Defendants fail in whole or in part because Defendants had no duty, under federal commodities or securities laws or otherwise, to disclose the information

33

that the Complaint alleges was omitted or misstated.

WHEREFORE, Defendants LJM Funds Management Ltd., LJM Partners Ltd., Anthony J. Caine and Anish Parvataneni respectfully request that this Court enter judgment in their favor and against Plaintiff Commodity Futures Trading Commission, award costs of suit and any other such further relief as this Court deems just and appropriate.

Dated: August 20, 2021        LJM FUNDS MANAGEMENT, LTD.,
LJM PARTNERS, LTD., ANTHONY J.
CAINE and ANISH PARVATANENI

By: /s/ Steven M. Malina
One of Their Attorneys

John F. Gibbons
Jeffry M. Henderson
Steven M. Malina
Todd E. Pentecost
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel: 312-456-8400
Fax: 312-456-8425
gibbonsj@gtlaw.com
hendersonj@gtlaw.com
malinas@gtlaw.com
pentecostt@gtlaw.com

*Attorneys for Defendants LJM Funds Management, Ltd., LJM Partners, Ltd., Anthony J. Caine and Anish Parvataneni*

*ACTIVE 59074344v8*

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned, an attorney, hereby certifies that on August 20, 2021, a true and correct copy of the foregoing **Defendants' Answer to the Complaint** was served electronically upon all counsel of record via the Electronic Case Filing system of the Court.

                                             /s/ *Steven M. Malina*